### LAMOUR v. NORTHERN IRON CO.

(Supreme Court, Appellate Division, Third Department. March 18, 1915.)

MASTER AND SERVANT ☞285, 286—INJURIES TO SERVANT—SUFFICIENCY OF EVIDENCE—SAFE PLACE TO WORK—PROXIMATE CAUSE.

In an action for the death of an engineer of a locomotive crane, which was overturned while being moved along the tracks, evidence *held* to raise a jury question whether the master failed to furnish safe ways, works, and machinery, and whether such failure caused the death of the engineer.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001–1003, 1006–1008, 1010–1033, 1035–1044, 1046–1050, 1053; Dec. Dig. ☞285, 286.]

Kellogg, J., dissenting.

Appeal from Trial Term, Essex County.

Action by Bridget Lamour, as administratrix of the estate of George Lamour, deceased, against the Northern Iron Company. Judgment for the defendant on nonsuit, and plaintiff appeals. Reversed, and new trial granted.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD and WOODWARD, JJ.

Leary & Fullerton, of Saratoga Springs, for appellant.

Weeds, Conway & Cotter, of Plattsburgh (T. B. Cotter, of Plattsburgh, of counsel), for respondent.

LYON, J. The death of plaintiff's intestate resulted from the overturning of a locomotive crane owned by the defendant, and operated by deceased, at defendant's iron works at Port Henry, N. Y., the night

of December 12, 1912. The case is now before this court for the second time. The judgment obtained by the plaintiff upon the previous trial was reversed, and a new trial granted. 163 App. Div. 131, 148 N. Y. Supp. 458. The retrial resulted in a nonsuit at the close of plaintiff's evidence. From the judgment entered thereon, this appeal has been taken.

The action was brought under both the common law and the Employers' Liability Act. Labor Law (Consol. Laws, c. 31; Laws 1909, c. 36) art. 14, as amended by chapter 352, Laws 1910. The crane weighed, according to the specifications, about 23 tons, had a minimum clearance above the rail of about 15 feet, exclusive of the smokestack, and traveled under its own power at a speed of 2 miles per hour. The frame of the truck was about 20 feet long, 5½ feet wide, 4 feet high, and supported the cab, on the floor of which were the engine, boiler, base of the crane, and other machinery, and was fitted with two four-wheel trucks, having a gauge of 3 feet and wheels 30 inches in diameter. Between the framework of the truck and the floor of the cab was an iron circle, which supported the cab and on which it rotated. An iron pin, known as a "locking pin," extended through the floor of the cab, and when pressed down entered about 2 inches into the framework of the truck. The purpose of this pin, so used, was to prevent the cab revolving, and to hold the boom in the line of the center of the track when straight. This locking pin passed through an iron collar at the cab floor, and was encircled by a spring, which held the head of the pin up from the floor a sufficient distance to raise the lower end above the frame of the truck, and hence; when not pressed down, the floor of the cab was not locked, but could rotate freely upon the circle between it and the frame. A hole had been cut through the side of the iron collar, through which a set screw passed which then turned up, entered a slot in the locking pin, and held it in place when pressed down into the framework of the truck. Unless the set screw were turned against the locking pin after it had been pushed into the framework, or a weight placed upon the head of the pin sufficient to overcome the lifting force of the spring, the pin would rise and allow the cab to rotate, swinging the boom to the right or left of the center of the track.

The crane had a capacity, without counterweights or outriggers in position, as stated on brass plates affixed to the sides of the frame by the builders, with which we may assume plaintiff's intestate was familiar, as follows: "10' 6" radius, 8,000 lbs; 15' radius, 5,070 lbs.; 20' radius, 3,520 lbs.; 23' 6" radius, 2,650 lbs." The capacity of the crane with the boom parallel to the track, or with the outriggers in position, was given as from 2,100 to 1,300 pounds additional. The crane was equipped by the builders with a boom 21 feet in length, and following its receipt by the defendant was so used until early in December, 1912, when the defendant substituted therefor a boom 28 feet in length constructed by its own employés, having an additional weight of upwards of 500 pounds, without, so far as appears, having consulted the designers of the crane with reference thereto, or placing additional counterweights upon the crane. It does not appear that

plaintiff's intestate was informed of the mechanical effect of the change of booms. He was an ordinary laborer, 28 years of age, who had been instructed as to operating the crane by his predecessor, a young man of 19 years of age, and on the 12th day of December, 1912, had been in charge of the crane for 5 weeks, receiving $2.25 per day on the night shift, which went on at 6 p. m.; the day shift coming on at 7 a. m.

Soon after midnight of December 12, 1912, plaintiff's intestate who had operated the crane with the longer boom for 9 days, was directed to take the crane from the northerly to the southerly end of defendant's yard, a distance of perhaps 1,000 feet, for the purpose of loading iron. Accompanied by his helper, who walked ahead or alongside of the crane, the deceased mounted the crane and passed at the rate of about 1½ or 2 miles per hour along the track, over a switch at a curve and up a slight grade, to a stub or slide switch about 8 feet long and about 500 feet from the place of starting, where the accident occurred. The helper, after noticing that the front wheels of the front truck had passed safely upon the switch, went to the third switch, some 40 feet farther on, when, hearing the deceased call that the boom was turning, the helper looked and saw that the crane was running backwards, and that the boom, from the end of which the magnet was suspended, had swung to a position just over the outside of the easterly rail. Running back, the helper, doubtless for the purpose of arresting the backward movement of the car, turned the brake upon the forward end of the truck, which he could reach from the ground. Suddenly the boom swung farther around, and the crane instantly turned over to the east; the top of the cab striking the deceased, who had endeavored to save himself by jumping, and inflicted injuries which resulted in his death that day. The boom lay on the ground on the easterly side of the track, at an angle of about 30 degrees. Owing to the overhead electric wires, it was probably carried by the crane, when moving, with the top at a height of about 16 feet. The boom could ordinarily be swung and controlled by a lever within the cab. This could not be done, however, while the crane was in motion; but it was necessary first to throw the locomotive clutch out, which deprived the crane of its power of propulsion, after which the power could be applied to control the swinging of the boom. Witnesses testified that, equipped with the 21-foot boom, the crane had been used and moved with the boom not centered upon the track, but at right angles to the track, but at what elevation of the boom does not appear, excepting in one or two instances.

The alleged negligence of the defendant, mainly relied upon by plaintiff at the trial, was an improper switch track, the replacing of the boom of 21 feet by that of 28 feet, and the failure to provide for holding the locking pin in position after it had been pressed into the truck frame. As to the track, the evidence most favorable to the plaintiff is that the ends of the easterly rail of the switch and main tracks did not come together within 2 or 3 inches, and that the westerly rail was 2 inches higher than the easterly rail—the switch curving slightly towards the east. As to the locking pin, it appears that the thread,

both inside the collar and of the set screw, was worn out or stripped, so that the set screw would no longer hold the locking pin in place, and that one of the prior operators of the crane had thrown the set screw away. While defendant had other set screws, they were evidently useless, in view of the condition of the thread inside the collar. Although the defendant contends that the deceased had not used the locking pin the morning of the accident, it appears from the testimony of his helper that the boom had stood over the center of the track during the whole journey of 500 feet from the starting point to the switch, and that its first divergence was after the crane had entered upon the switch, and at the time of the accident.

This testimony, in view of the testimony of another witness that, with the locking pin not in place and held down, the crane would not move more than about 15 feet, without the crane swinging around, is confirmatory of plaintiff's claim that the locking pin was in place and effective during at least the trip to the switch. Furthermore, a witness testified that he examined the crane the morning of the accident as it lay overturned, and that the locking pin was then in the collar, with about half its length above the cab floor. As one of the matters of evidence before the court upon the second trial, and not proven upon the first trial, the plaintiff called one Marshall as an expert, who testified that the difference in weight, or bearing on the counterweight, of the magnet placed upon the 28-foot boom, over that placed upon the 21-foot boom, was 7 tons; also that the additional strain upon the king pin·and the floor of the cab by the 28-foot boom over the 21-foot boom should be considered and would affect the locking pin, and indeed might be sufficient to raise the locking pin out of the truck frame, even. if the operator were standing on the locking pin.

While it is necessarily a matter of some speculation as to the exact occurrences immediately. preceding the overturning of the crane, it would appear reasonable, from the fact of the deceased calling to his helper that the boom was turning, and from the then backward movement of the crane down the grade northerly, that the deceased, realizing the conditions, had sought to transfer the power of the crane from the running gear to the lever, which might control the swinging of the boom. Perhaps in the emergency, out of several levers in the small cab, he may have taken hold of the wrong one, possibly of the lever which swung; the boom to the east, as suggested in one of the briefs, as there was no light in the car, and none in the yard, excepting that furnished by the cluster of' electric bulbs upon the north wall of the laboratory, 30 or 40 feet away, which the witness says lighted the field from the laboratory to the switch "a little bit."

Neither can we say that under the evidence it is improbable that the crane, upon entering the switch and being necessarily tilted somewhat towards the east, by reason of the westerly rail being higher than the easterly rail, and such motion being communicated tò the magnet, weighing 3,250 pounds suspended at the outer end of the 28-foot boom, may not of itself have caused the overturning of the crane, or may not have raised the locking pin sufficiently to have released the frame, necessarily resulting. in overturning the crane. Concededly the de-

·ceased had the right to rely upon the defendant furnishing him safe ways, works, and machinery, and whether or not it did so, and whether, if not, its failure in that respect resulted in the death of plaintiff's intestate, were fairly, under the evidence as it now stands, questions of fact for the determination of the jury.

As the allegation of contributory negligence is one of defense, and cannot be said to have been established as matter of law, it need not be discussed at this time.

The judgment appealed from should be reversed, and a new trial granted, with costs to the appellant to abide the event. All concur, WOODWARD, J., in result, in memorandum, except KELLOGG, J., who dissents.

WOODWARD, J. I concur in the result. There is a question for the jury, whether the change in the length of the boom constituted negligence. I do not wish to pass on the question of whether such a finding would be against the weight of evidence. There is, however, this question in the case, and I think it was error to grant a nonsuit. This much is not inconsistent with the previous opinion.